915 F.2d 1557
 Unpublished Disposition
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Carlos ALICEA-MARTINEZ, Plaintiff, Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 No. 90-1262.
 United States Court of Appeals, First Circuit.
 Sept. 27, 1990.
 
 Appeal from the United States District Court for the District of Puerto Rico; Juan M. Perez-Gimenez, District Judge.
 Louis A. deMier on brief, for appellant.
 Daniel F. Lopez Romo, United States Attorney, Jose Vazquez Garcia, Assistant U.S. Attorney, and Robert J. Triba, Assistant Regional Counsel, Department of Health & Human Services, on brief, for appellee.
 D.P.R.
 AFFIRMED.
 Before BREYER, Chief Judge, SELYA and CYR, Circuit Judges.
 PER CURIAM.
 
 
 1
 Carlos Alicea Martinez ("claimant") appeals from a district court judgment affirming a decision by the Secretary of Health and Human Services to deny his application for social security disability benefits. We find substantial evidence in the record in support of that decision and therefore affirm.
 
 
 2
 Claimant was born on September 4, 1953, remained in school through the ninth grade, and thereafter worked as a warehouse stock clerk, as a janitor, and most recently as a gas station attendant. On September 25, 1986, he filed an application for disability benefits, alleging an inability to work since September 21, 1986 on account of seizures, left side weakness and blindness in the left eye. He met the insured status requirements through June 30, 1987. Following a hearing at which claimant, his wife and a vocational expert ("VE") testified, the Administrative Law Judge ("ALJ") denied the application at step five of the evaluative sequence. See 20 C.F.R. Sec. 404.1520. The Appeals Council and the district court, at the recommendation of a magistrate, subsequently endorsed this determination.
 
 
 3
 The record reveals that, between September and December 1986, claimant was seen on several occasions at Cook County Hospital in Chicago for complaints of seizure activity. He first visited the hospital on September 16 after having suffered a blackout two days earlier. As described by his wife, this attack commenced with involuntary left hand movement, followed by loss of consciousness for two to three minutes, involuntary movements on the left side of his body, biting of his tongue and loss of bladder control. He recovered without headaches or weakness. At the hospital, claimant disclosed a history of occasional involuntary movements down his left arm, without weakness, over the previous six years; he apparently had sought medical assistance only once,[1] however, and had never received medications for his condition. Claimant was hospitalized from September 20 to September 24 for testing, during which time no seizure activity was observed. Laboratory tests, including an electroencephalogram, were all normal, as was a subsequent CT scan of claimant's brain performed on September 26. The discharge summary referred to a "generalized tonic clonic" seizure (that involving alternate muscular contraction and relaxation in rapid succession) and "persistent left hemiparesis" (muscular weakness affecting one side of the body). He was referred to neurology for follow-up. No medications were prescribed.
 
 
 4
 Claimant was examined on October 15, 1986 by Dr. N. Cay, whose specialty is not identified. Dr. Cay recorded claimant's medical history, citing episodes of intermittent shaking in his left arm, including one two days earlier. He described claimant as alert, cooperative, and fully oriented. Gait was normal but with a slight limp favoring the left side; claimant's left leg was slightly shorter than the right. There was no limitation of motion. Neurological results revealed normal coordination and no sensory deficits. Dr. Cay noted that claimant had received no medical treatment and taken no medications for his condition, which he characterized as a seizure disorder.
 
 
 5
 On October 22, 1986, claimant returned to Cook County Hospital after experiencing another seizure the previous evening. No mention of a blackout was made, and his left side weakness had not worsened. A physical examination was performed, revealing normal results, and medication was for the first time prescribed. Claimant was thereafter treated on three further occasions at the hospital.[2] On November 21, he complained of shaking in his upper left arm; on December 6, he complained of pain in both arms. Examinations were essentially normal in each instance, and claimant was instructed to continue taking his medication. His final hospital visit was on December 26, 1986, when he reported several episodes of tremors and shaking in his left arm occurring the previous day. Decreased muscle strength in the left side was observed, but no pain was reported. Claimant was again prescribed medications. No further evidence of seizure disorders appears in the record. At the hearing, held in July 1988, claimant testified that "lately" he has not had seizures "too frequently" because he "follow[s] the doctor's orders about taking the pills." He specifically denied having had a seizure since his return to Puerto Rico a year earlier.
 
 
 6
 Claimant has also suffered from visual impairment, particularly in his left eye, ever since a childhood disease. The hospital records from September 1986 report horizontal and rotatory "congenital nystagmus" (an involuntary rapid movement of the eyeball), as well as "progressive focal neuropathy" (a general term denoting functional disturbance) of unknown etiology. Horizontal nystagmus was again noted on October 22 and December 26, 1986, and his left pupil was described as "unreactive to light" on the latter occasion. In his October 15, 1986 report, Dr. Cay recited claimant's complaint of poor vision in his left eye ever since childhood, but noted that he had never consulted an ophthalmologist. His examination revealed vertical and horizontal nystagmus bilaterally, more so in the left eye. Claimant's vision, corrected with eyeglasses, was measured as 20/40 on the right, 20/more than 100 on the left. Dr. Cay also observed that claimant was able to ambulate without apparent difficulty.
 
 
 7
 Examinations performed in 1988 disclosed a worsening of claimant's vision. Dr. Salazar, an ophthalmologist, found on July 14, 1988 that vision was 20/100 in the right eye and "count fingers" in the left. He reported rotary nystagmus in both eyes. And as to the left eye, he found exotropia (deviation of the visual axis of one eye away from that of the other), degeneration of the macula (part of the retina), and atrophy of the nerve. A second ophthalmology examination, performed on September 7, 1988 by Dr. Latimer, measured claimant's corrected vision as 20/100 in the right and no light perception in the left. Largely echoing the findings of Dr. Salaza, he reported nystagmus in both eyes, exotropia and optic atrophy in the left, and myopic astigmatism.
 
 
 8
 The record also contains two assessments of residual function capacity ("RFC") by physicians who reviewed the medical evidence on October 29 and December 24, 1986, respectively. They each reported restrictions as to heights, ladders and hazardous machinery. Otherwise, claimant's exertional capacities were essentially unlimited.
 
 
 9
 Based on his evaluation of this evidence, the ALJ concluded that claimant retained the capacity to perform light and sedentary work, not requiring normal bilateral vision, on a sustained basis. He found that claimant's seizures were adequately controlled by the medication, emphasizing in this respect the lack of any further such episodes after December 1986. And in reliance on Dr. Cay's report, he found that claimant was not statutorily blind during the relevant period. At the hearing, the VE was asked about the vocational opportunities available to someone limited to light unskilled work who had 20/40 vision in his good eye with further restrictions on heights, moving machinery and driving. The VE responded that there were numerous jobs in the national economy that such an individual could perform, including bagger, packager and hand labeler. Based on this testimony, and using the grid rules as a framework, the ALJ denied the claim at step five.
 
 
 10
 We find the ALJ's conclusions amply supported by the evidence. No physician of record has suggested that claimant was unable to work. The ALJ's findings as to exertional capabilities are more favorable to claimant than those reflected in the two RFC's. As to claimant's visual impairment, the ALJ was entitled to give greater weight to Dr. Cay's report than to the two subsequent ophthalmology reports--particularly since the latter two were prepared over a year after claimant's insured status expired on June 30, 1987. The fact that claimant's vision subsequently deteriorated does not undermine the ALJ's findings as to his visual capacity during the relevant period. Indeed, claimant on appeal has not specifically challenged the factual assumptions contained in the hypothetical questions to the VE. Rather, he contends that the ALJ improperly discounted his complaints of pain and weakness and ignored the fact that he was a "slow learner." Yet the record is replete with references to claimant's denying the existence of pain, and he voiced no complaint as to pain at the hearing. While claimant's left side weakness is documented on the record, the severity thereof is nowhere described. In any event, the ALJ's findings with respect to exertional capacity are fully supported by the two RFC's and elsewhere in the record. Finally, claimant's application for benefits contains no reference to any intellectual or psychiatric deficiency. He has raised this issue, moreover, only by observing that he had been placed in a "slow learners" class in second grade--which ignores the fact that he was gainfully employed thereafter for many years.
 
 
 11
 Affirmed.
 
 
 
 [1]
 The record shows that claimant was seen at Cook County Hospital on August 18, 1982, for occasional shaking in his left arm and neck, and was referred to neurology. The September 16, 1986 records recite that he was seen twice by a neurologist in 1982 and that a brain scan was negative. No other evidence of treatment prior to September 1986 has been presented
 
 
 [2]
 The record also shows that he visited the hospital on November 10, 1986 to obtain a refill of his medication, at which time he was described as "asymptomatic."